SOVEREIGN CAMP WOODMEN OF THE WORLD *v.* KROPP.

4-3520

Opinion delivered July 2, 1934.

*Rainey T. Wells* and *Hill, Fitzhugh & Brizzolara,* for appellant.

*A. M. Dobbs,* for appellee.

MEHAFFY, J. This suit was brought by the appellee against the appellant in the Sebastian Circuit Court on an insurance policy issued to appellee's father, E. C. Dunbar. The original certificate or policy was issued March 18, 1899, and various certificates had been issued to him in lieu of the original policy. It is admitted that all assessments and dues from that time up to January, 1933, were paid. The suit was for $1,000, less some charges, and complaint was in the usual form. The appellant answered, admitted issuing the certificate on the date mentioned and that the dues and assessments were all paid except the assessment or dues which were due the last day of January, 1933. Appellant defended on the grounds that the dues due in January were not

paid until February 16, and that Dunbar was at that time not in good health but suffering from tuberculosis. He died on May 7, 1933. The certificate or policy of insurance was introduced in evidence and also a letter from the appellant association dated May 31, 1933, stating that a check had been sent to Mrs. Kropp for $1.60, being a refund of the January and February installments, and she was advised that the financial secretary at Fort Smith, Arkansas, had been instructed to return any amounts paid for subsequent installments. Mr. Dunbar applied for admittance in the Woodmen of the World Sanitarium in the latter part of March, 1933.

A. M. Waldron, captain of the uniform rank of the Woodmen of the World, testified that he was a member and knew Dunbar. He testified that B. H. Smith, financial secretary of the Local Camp of the Woodmen of the World, keeps the records of the payments of assessments and collects the same from the members. Witness called at Smith's office to ascertain whether or not Dunbar was in good standing, and Smith told him that he was. Smith had been secretary for about four years. This witness went with Mr. Kropp to the office of Smith, the secretary, to interview him with reference to hospitalization of Ed Dunbar. Mr. Smith said that Dunbar had a policy, and the best of his recollection is that his assessments were paid; he said he was in good standing. Smith gave Mr. Kropp an application for hospitalization. It was about the 12th or 15th of the month. The application was made by Dunbar the latter part of March.

Dr. Riley testified that he examined Dunbar March 15, 1933, in Booneville, Arkansas, and that he had very advanced tuberculosis in his lungs. That there was no question in his mind but that Dunbar was suffering from active tuberculosis.

B. H. Smith, the financial secretary, testified and introduced the card record which is the final record of the membership standing. This record is kept by Smith, and he testified that the January assessments were paid on the 16th of February; that the February report shows

that Ed C. Dunbar was suspended for nonpayment of January dues. The March report was sent in for February dues on March 13. It shows that Dunbar was remitted for by the secretary for the months of January and February. He further testified that Dunbar was suspended February 1, but that the reports did not leave his office until the 13th and did not get to the home office until the 16th. That he stood suspended as of January 31st. On February 16th he was under suspension. He also testified that he did not tell Mr. Kropp or Mr. Waldron that Dunbar was in good standing because he said that is up to the home office. He did not know that Dunbar had tuberculosis at the time payments were made. It was admitted that the payments were returned. He said that Dunbar's sister made the payment, and he asked her why she did not come in sooner, and she said Ed had been sick. Mr. Kropp made the payment in March. Witness had been financial secretary for six years. It is the duty of the secretary under the by-laws to remit to the Sovereign Camp on or before the 5th day of every month the funds in his hands, and accompanying the remittances he must forward a detailed statement of the standing of members in the camp on blanks furnished for that purpose. He mailed the February report on March 13. A provision of the by-laws provides that if the remittances from the secretary are not received on or before the 15th day of the month the camp and all its members shall stand suspended. Witness said that he did not get any information that the camp was suspended. The report did not reach the home office until February 20th. Witness further testified that at different times in the past he had maintained Ed Dunbar in good standing by the payment of the dues himself. He said that prior to this date, February 20th, he had reported Dunbar suspended, but said he could not tell without going to his records. Prior to this time he had loaned Dunbar money to pay his dues. He loaned him about $25 and Dunbar assigned to him another insurance policy, and after Dunbar died he got his money. The secretary of the association at

Omaha, Nebraska, is supposed to mail out a notice of the suspension. The evidence does not show that Dunbar ever received this notice. The secretary further testified that he mailed the notice to him before he was suspended, around the 5th of February. He testified that he paid the dues for him, that there was no enmity between them, and that he did not fail to make the payment because he was mad at him; he did not consider that he had a chance to get his money. He also testified that Waldron called him up and asked him if Dunbar's dues were paid, and he thinks, he told Waldron that Dunbar was entitled to hospitalization. Whenever members failed to pay before secretary sent in his report, he sent them in as suspended unless he wanted to stand personally responsible for the payment of their dues. The question of Dunbar being admitted to the hospital came up after February 16, after the secretary's report went in. Certain receipts were handed him, and he said there were other amounts included, that Dunbar had other policies, that his record shows that the January assessment was not paid. Before that time Dunbar had made the payments in the regular course at witness' office; witness had not paid any of the later assessments in 1932.

Dr. J. E. Little testified that he was at Dunbar's home on the 15th or 16th of February; that Dunbar had a cold and was very sick. He was in his office then at different times up to the 14th of March. He had a cough, and witness found trouble with his lungs; thinks he had tuberculosis but does not know. He died in the tuberculosis sanitorium at Booneville. Witness did not find that he had tuberculosis; he just had a bad cold. He said some people take tuberculosis quickly, and from his examination in March he thinks perhaps Dunbar had consumption, but he examined him in February and found no indication of it.

Here several provisions of the constitution and by-laws were introduced.

John T. Yates testified by deposition about the issuance of the original policy and the changes made and

identified the constitution and by-laws. He said that Dunbar failed to pay the January, 1933, installment to the financial secretary of the Local Camp on or before January 31st as required by the provisions of the beneficiary's certificate and constitution and by-laws. That he obtained this information from the regular monthly report which he received from B. H. Smith, financial secretary of the Local Camp. Then he testified about refunding the payments. He also testified that Dunbar did not pay the increases and therefore his policy was chargeable with $385.11. He then introduced several letters.

Appellant contends that the court erred in refusing to direct a verdict for it because Dunbar failed to pay his January assessment and thereby became suspended. The by-laws provide that, if one fails to make payments on or before the last day of the month, he shall become suspended and his certificate shall be void, etc. It also provides however, that, if the person suspended is in good health, he may make a new contract or, if he is suspended for the nonpayment of installment, if in good health, he may within three months from the date of his suspension again become a member of the association by the payment of current installment assessment and all installments which should have been paid to maintain him as a member. It is contended first, that he did not make the January payment until the 16th of February, and at that time he was not in good health but had tuberculosis. The only evidence tending to show that he failed to make the January payment is the testimony of Smith, secretary of the Local Camp, and he testified that he thought Dunbar was entitled to hospitalization, although he knew that, if he was suspended or not in good standing, he was not entitled to hospitalization. His testimony, we think, was such that the jury would have been justified in finding that the January dues had been paid. The burden was upon the appellant to establish the fact that the dues had not been paid by a preponderance of the evidence. "While the burden is on the plaintiff in an action on a benefit certificate to show insured's good standing at the time of his death, still, as the certificate is proof of

good standing at the time of its issuance and raises a presumption that such good standing continued, it follows that when the certificate is introduced, the burden is on the association to prove loss of good standing. * * * And generally, in an action on a policy or mutual benefit certificate, the issue of the policy or certificate of insurance, and the insured's death being shown by plaintiff, the burden is on the company to show nonpayment of premiums or dues or other matters going to avoid the policy." Cooley's Briefs on Insurance, vol. 4, 3863-3864; *United Order of Good Samaritans v. Reavis,* 186 Ark. 1143, 57 S. W. (2d) 1052; *Supreme Council American Legion of Honor v. Haas,* 116 Ill. App. 587; *Ry. Passenger & Freight Conductor's Mutual Aid & Benefit Ass'n v. Thompson,* 91 Ill. App. 580; *United Brotherhood of Carpenters & Joiners of America v. Fortin,* 107 Ill. App. 306; *Sleight v. Sup. Council of Mystic Toilers,* 133 Iowa 379, 107 N. W. 183; *Kidder v. Sup. Commandery, United Order of Golden Cross,* 192 Mass. 326, 78 N. E. 469; *Hood v. Sov. Camp Woodmen of the World,* 188 Ark. 1048, 69 S. W. (2d) 880.

It is next contended by appellant that there is no question of estoppel in the case, and for that reason it especially objected to instruction No. 1 given at the request of plaintiff because of that portion of the instruction with reference to the acts of the local secretary constituting an estoppel. It is argued that the by-laws do not permit the local camp or officers to waive any of the provisions of the contract and that the acts of the local secretary could not operate as an estoppel. The by-laws, however, provide that, unless the local secretary makes his report by the 15th of the month, the camp and all of its members are suspended. The undisputed evidence shows that the local secretary frequently made his report after the time provided for by the by-laws and no action was ever taken. It thereby waived the right to suspend the members or the local camp because of a failure to comply with this by-law.

The fact that the local secretary did not make his report on time was necessarily known to the Sovereign

Camp. This court quoted with approval, the following: ''Forfeitures are so odious in law that they will be enforced only where there is the clearest evidence that such was the intention of the parties. If the practice of the company and its course of dealings with the insured, and others known to the insured have been such as to induce a belief that so much of the contract as provides for a forfeiture in a certain event will not be insisted on, the company will not be allowed to set up such a forfeiture, as against one in whom their conduct has induced such belief. * * * The clerk, through a period of years, had adopted the method set forth in the original opinion, which was clearly calculated to induce the belief on the part of Newsom that his dues had been paid according to the method adopted by the local clerk for collecting the dues and reporting the same, and that the society had accepted such payments and would therefore not insist upon a forfeiture because of the failure of the clerk to comply, in this respect, with its laws and constitution.'' *Sov. Camp W. O. W.* v. *Pearson,* 155 Ark. 328, 244 S. W. 344.

The evidence in this case shows that Dunbar had paid his assessments regularly for thirty-four years, and the only evidence that he failed to pay his January dues on time is the testimony of the secretary of the local camp, contradicted by some of his own statements, especially when he stated that he was entitled to hospitalization, when he would not have been if he had not been in good standing, and this evidence given after Dunbar himself had died and could not testify. Moreover, the secretary admits that he had been in the habit of paying his dues, although he said he did not do it in the later part of 1932. We think it is wholly immaterial in this case whether there was a waiver or estoppel or whether Dunbar was in good health, because, the jury would have been justified in finding that the appellant had failed to show by a preponderance of the evidence that the January dues had not been paid.

It is next contended by the appellant that the court erred in allowing the provision of the constitution in

regard to incontestability to be read to the jury. The appellant itself introduced the constitution and bylaws, and in construing them it was perfectly proper to consider the whole of the constitution and by-laws and construe all of its provisions together. Moreover, the parties agreed in the trial that the constitution and by-laws were considered as having been introduced in evidence with the agreement that either side might offer such parts as it desired. There was no error in permitting this section to be read to the jury.

It is contended that there were errors in the instructions, but the instructions, when considered as a whole, constitute a correct statement of the law, and it would serve no useful purpose to discuss them at length. Each side requested instructions, which were given by the court, on practically every feature of the case.

We find no error, and the judgment is affirmed.